[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The petitioner, Diana P. has filed a motion to revoke the court order that transferred the guardianship of her two oldest sons, Robert and Joshua to the children's paternal grandfather, Robert P. Sr. Additionally Diana P. requests that this court enter a finding that conduct by Mr. P. CT Page 3766 constituted contempt of court.
I. Procedural Background
On July 30, 1996, when Robert and Joshua were four years old and three years old, respectively, the Commissioner of the Department of Children and Families (Department) filed a petition alleging that these children were neglected. The Department relied upon allegations that Diana P. was actively abusing drugs and alcohol, during which time she neglected the needs of her children. As a result of the petition Diana P. voluntarily placed the children in foster care. On May 16, 1997, upon return of the children to their mother, a court ordered that the children remain under the protective supervision of the Department.
During the period of protective supervision, Diana P. continued to use illicit substances. Consequently, in June 1997 the department secured an order for the children's temporary custody. After a series of hearing dates, on November 21, 1997 a court committed the children to the custody of the Department. At that time, the children were placed in the care of their paternal grandparents, Mr. and Mrs. Robert P. Sr. They have remained there since that date.
On August 8, 1998 and again on June 16, 1999, a court extended that commitment, each time for a period of one year.[1] On December 14, 1999, pursuant to agreement by the parties, the court ordered that the department transfer custody and guardianship of these children to their paternal grandfather.
At the time of the transfer of guardianship, all parties entered into a stipulation. Among the more relevant of the provisions were:
 (a) That the guardians would allow unsupervised visits between the children and Diana "provided that said visitation is in the best interest of the children."
 (b) That the Diana would provide notice if she were unable to attend a Sunday visit.
 (c) That the guardians would have the children participate in individual therapy as recommended by a therapist.
 (d) That the guardians would permit the children to participate in family therapy.
CT Page 3767
That agreement was modified by court order on August 2, 2000. In September 2000 there were further modifications. The relevant portions of tat agreement were:
 (a) That Diana would be allowed to visit her children from 4:00 p.m. to 7:00 p.m. each Sunday, unsupervised but in the general vicinity of the guardian's home. Diana was allowed to bring the children's half brother and maternal grandmother to these visits.
 (b) Diana would arrange family therapy "provided child's current therapist agrees to family therapy, or makes a written statement to the contrary.
 (c) Guardian agreed to "provide Mother with a copy of their insurance providers."
 (d) Diana "will not speak to the children about their father, Court, Guardians or other inappropriate issues outside of the family therapist sessions."
 (e) Guardians "will not speak to the children about their mother in a derogatory fashion. Nor [sic] shall they speak about Mother in the presence of the children."
On September 14, 2000, within weeks of this agreement, Diana P. filed a motion to open and transfer guardianship of her sons from their paternal grandparents to herself. Subsequently, she filed a motion for contempt wherein she alleged:
 (a) that the guardians had refused to allow court ordered visitation and family therapy;
 (b) that guardians refused to provide respondent mother with a list of the insurance providers under their insurance policy; and
 (c) that the guardians spoke about her "in negative terms."
The motion for revocation and motion for contempt were heard simultaneously on December 4, 2000 and January 3, 2001. CT Page 3768
II. Facts
Based upon the evidence introduced at trial, this court finds the following:
Since the transfer of guardianship in the present case, the Petitioner, Diana P. has made efforts to deal with the substance abuse and domestic violence issues which had plagued her children's lives. She currently resides with her significant other, Barry H and their child, Robert and Joshua's younger half brother. There is no indication that this younger sibling has been neglected or abused.
Diana P.'s current therapist, Ron Tanguay, has cited her strides in several areas. He is convinced that Diana P. can be a positive role model in her children's lives. Unfortunately, her substance abuse and domestic violence problems only recently have been contained. There is no indication that Diana P. can maintain her current freedom from drugs.[2]
Furthermore, Mr. Tanguay sessions are with his client only. He is not in a position to adequately evaluate the needs of either Robert or Joshua, the subjects of this action.
The evidence adduced at the hearing indicates that Diana P. has some difficulty placing the needs of her older sons before her own personal desires. For example, she is enormously concerned that her visits with Robert and Joshua include her youngest child as well. Although she understandably wishes to develop close sibling ties, this desire is contrary to the current needs of her two older sons.
Additionally, the court is convinced that despite repeated cautions, she has engaged in inappropriate conversations with her sons, discussions that are contraindicated in this stage of their young lives.[3]
Additionally, she is so adamant that she be allowed scheduled visits that she is apparently willing to have her sons forego parties with their friends or planned vacations with their guardian. She insists that there be family counseling despite the fact that the children's therapist feels that such therapy is not in the children's best interests at this time.[4]
There is real conflict between Diana P. and the children's current guardian.[5] Part of the friction is due to the fact that Respondent Mother is inconsistent with her commitment to these children's needs. She is often late for her scheduled visits. She insists on bringing her youngest child to these visits despite the protests of Robert and Joshua. During the visits, she has inappropriate conversations concerning the pending court matters. These discussions only serve to render the children anxious and concerned. Their need for permanency is severely CT Page 3769 disrupted each time the subject is broached. According to Diana P. own testimony, the boys have become more distant during their weekly visits.
Visits between respondent Mother and the two boys have been a source of continued controversy. After the visits, the children's conduct regresses. At times they do not wish to see their mother. During the unsupervised portions of her visits, Diana P.'s judgment is questionable. The court credits the testimony that she allowed these young boys to use BB guns. The court additionally accepts the testimony that the boys were allowed to ride bicycles without helmets and were left without food for large portions of the day despite the fact the effectiveness of their medication depended upon regularly scheduled meals. Finally the court accepts the testimony that during visits Robert did not always receive his proper medication.
Although some of Mr. P.'s actions have been questionable,[6] for the most part he has been an appropriate guardian. The two boys have thrived under his care. They are now medically stabile. Their academic levels have soared. They are active in sports. They have developed interpersonal relationships with their peers. Indeed, Joshua no longer needs individual counseling.[7]
The children's internal conflict was noted by their therapist, Claudia Della Bitta. Ms. Della Bitta testified that the children feel betrayed by their mother. Both Joshua and Robert wish to remain with Mr. P. It was the therapist's opinion that these children should not be returned to their mother.
III. Legal Analysis
The critical matter before the court is a motion to revoke a transfer of guardianship. Caselaw concerning revocation of state commitment is instructive. "The burden is clearly upon the persons applying for the revocation of commitment to allege and prove that cause for commitment no longer exists. Once that has been established, the inquiry becomes whether a continuation of the commitment will nevertheless serve the child's best interests." (Internal quotation marks omitted.) In re CesarG., 56 Conn. App. 289, 292-93, 742 A.2d 428 (2000). "[T]he primary focus of the court is the best interests of the child, the child's interest in sustained growth, development, well-being, and in the continuity and stability of its environment." Cappetta v. Cappetta, 196 Conn. 10, 16,490 A.2d 996 (1985).
This case is problematic. Eventually, with counseling and patience, if she remains sober and avoids domestic violence, Diana P. can be a proper caretaker for her two older sons. Unfortunately, at the present time she CT Page 3770 is more focused on her desire to reunify her family rather than the children's need for stability. Furthermore she has difficulty accepting responsibility for any of the problems she currently faces. Given the children's chaotic past and recognizing the fact that these children fear abandonment, the court must conclude that Diana P.'s actions are not those of an appropriate caretaker. Because Diana P. cannot properly care for these boys, the court must conclude that the cause for commitment continues to exist.
Even if the cause for commitment no longer existed, that finding would not be dispositive. The focus shifts to the children's best interests. Inre Juvenile Appeal, 177 Conn. 648, 658-59, 420 A.2d 875 (1979); In reAlexander C., 60 Conn. App. 555, 559, ___ A.2d ___ (2000).
The guardians have demonstrated that it is not in the children's best interests to return custody to their mother. Relevant factors include the circumstances surrounding the initial commitment, the length of the separation between mother and children, and the intervening relationship that had developed between the children and their guardian. The most compelling, but not exclusive, testimony in this regard was that of the children's therapist.
IV. Conclusion
The Petitioner's Motion to Revoke Guardianship is hereby DENIED.
The Petitioner's Motion for Contempt is hereby DENIED.
Julia DiCocco Dewey, J March 4, 2001